Good morning. My name is Richard Martinez. I represent Stephen Garcia. I request to reserve five minutes for rebuttal. Your Honors, the Rehabilitation Act of 1973, like the Americans with Disabilities Act of 1990, was enacted to expand employment opportunities for individuals with a disability. At the heart of both acts are specific affirmative responsibilities for employees and clear prohibitions against discriminatory employment decisions. Among those covered by these acts are included those who have been diagnosed with post-traumatic stress disorder. This segment of our population includes the 12 to 20 percent of the veterans who served in the Afghanistan and Iraq wars. Of the 2.5 million military personnel deployed to Afghanistan and Iraq, over 800,000 were sent there multiple times, many within the minimum time requirements. Stephen Garcia, while on his second deployment to Iraq, he was diagnosed with PTSD while still in country, while in Iraq. This diagnosis was due to his exposure to the toxic environment inherent in a combat zone. As Mr. Garcia stated in his OPR interview on March 19, 2009, for two-plus years I have struggled with the events of two tours in Iraq as a Calvary Scout. I have seen my friends burned to death, blown up, lose limbs. I have picked up the remains of executed civilians. What I'm trying to say is that I would never dishonor my lying. All I want is to continue to protect my country. I am currently being treated by the Veterans Administration here in Tucson for post-traumatic stress disorder. And that is uncontested? Yes. His diagnosis is uncontested? Yes, it is uncontested. And that admission or that diagnosis satisfies certainly from the plaintiff's perspective, prong one of what is you're showing. Does he have a disability that affects one or more major life functions? Two, can he perform the essential functions of his position as a criminal investigator, which was an entry-level position? And three, was he terminated for conduct for that disability? In addressing the third that the events of December 6-7, they start on December 6, the early hours December 6 and lead into the early morning hours of December 7, 2008, occur in Tempe, Arizona as a result of a PTSD incident. The evidence on that point is overwhelming. Whether you look to the reports of Dr. Wilson, who provides three very specific forensic, psychological expert examinations on that point, whether you look to the work of the OPR investigative work of Senior Special Agent Mendoza, or you look to even the words of Mr. Allen himself, the SAC for ICE in Arizona at the time, they all knew before the April 28, 2009 decision to terminate Mr. Garcia, that the events involved a PTSD incident. The events we're talking about, I want to make sure I'm clear what we're talking about here. If I understand correctly, he was basically bar hopping in this college town and got drunk and became abusive to various people? Your Honor, that's one characterization. I don't think it's all that inaccurate, but he was drinking, he was intoxicated, but I want to make clear, Your Honor, as Dr. Wilson points out in his report, his intoxication is in no way connected to the PTSD incident. In fact, as Dr. Wilson states in his third report, that PTSD incident would have occurred absent Mr. Garcia drinking that evening. So being out that evening at those locations, something triggered the event. Be that as it may, he gets drunk, he becomes abusive, and starts exerting his authority as a law enforcement officer. Is that right? Well, the evidence before the court in this record points to his conduct being the result, and only the evidence, instead of just being verbally abusive. Suppose he pulled out his gun and shot somebody, then what? Well, Your Honor, that raises certainly the issue that has been raised by counsel for the government in Weaving v. City of Hillsborough, is that is there a line by which, at a certain point, an employee or a person claiming discrimination under the Rehabilitation Act cannot assert that he is a qualified individual with a disability. That is, can he perform the essential functions of the position? And clearly, that the law of this circuit, Your Honor, is that when you engage in specific conduct which arises to the egregious level of making threats, threats of personal harm, threats to the personal safety of individuals, be that that you are outside or you cannot demonstrate that. This is not that case, though, Your Honor. This is a case where, if you look to the letter of termination of April 28th of 2009, signed by Mr. Allen himself, all he points to for the basis for termination is the use of the F-word. And I apologize, but I just I'll just leave it at that. And he points to, for example, in the 911 call made by Mr. Garcia, that he uses the F-word several times on that occasion. He also points to the fact that when he interacts with an ICE agent on duty in Tucson, that he has that special agent, McKenna, when he has a phone conversation with him, he uses some expletives. He uses the B-word and he uses, again, the F-word. But on no occasion, Your Honor, was Mr. Garcia, in this event, did he have his firearm with him. He made no threatening statements. He engaged in no threatening acts. And he certainly did not suggest that he intended to do such. But, Counsel, it's very concerning, getting back to Judge Silverman's question, whether a weapon was used or brandished on this occasion or not. I think the record is that he had a flashback experience and was talking into a cell phone like as though it was a walkie-talkie and misunderstood where he was because of his post-traumatic stress disorder. So could you go back to the qualification issue, the employer's concern about his ability to do the job? Right. It seems to me to be the nub of the case. Yes. And I think that we point to a number of specific items of evidence to One is, Your Honor, just days before this incident on December the 6th and 7th of 2008, he had just completed the Federal Law Enforcement Training Academy. That academy is where he had been sent as a new employee of ICE to be trained. He'd spent six months there training to be a criminal investigator. And I said this was an entry-level position. It's clear that when he's there, he has PTSD and he's able to complete successfully, which is undisputed and admitted to by the defendant, by the government, that he had completed this program. Another factor to consider, Your Honor, is that this event, this December 6th, 7th, is his first PTSD event that he had. I think the lay term is flashback. That's the way I think about it. I think they use that in the record, right? Yeah. And that he has that flashback event that is triggered and he has intrusive thoughts, undeniably. That's part of what occurs here for individuals. But these are things that the agency itself knows. If you look to the... But how would you have them accommodate them? How is it that he's going to be qualified to do the job? Recognizing that he has this diagnosis? And I think it's several things that can happen, Your Honor. I think in this record, it's clear that, at best, Mr. Garcia had requested time off to leave at the purposes of attending therapy. So maintaining the maintenance of therapy was a request. That request was not honored. But he engaged, and as documented by Dr. Wilson, in an intensive therapeutic efforts that were offered by the Veterans Administration in Tucson. And we have an exceptional PTSD center there, where he was essentially able to, one, recognize the parameters, the dimensions of his condition, and number two, how to manage it. Part of that's medication, Your Honor, in frankness. As he states in his OPR investigation, he takes a medication to help him sleep. He also takes a medication, essentially, to help him deal with when he feels stress or to deal with the notion of intrusive thoughts. But, Your Honor, in this particular case, what we have, because the ADA and the Rehabilitation Act always require individualized inquiry, do you have an individual who's so affected by his post-traumatic stress disorder, his post-traumatic stress syndrome, that he's incapable of performing in this position? The record before the court demonstrates that he is capable of performing the evidentiary burden in the context of a motion for summary judgment, and that the government failed to dissuade or to poke, essentially, poke a hole into that evidence. And they offered that evidence, Your Honor, as you know, we challenged the Allen Declaration in a motion to strike for untimely disclosure, and for, I will wrap up, Your Honor, for untimely disclosure. And we also challenged it on the basis of the lack of foundation, and contrary to the deposition testimony of Mr. Allen himself. I will save the last three minutes, three plus minutes, for rebuttal. Thank you, Your Honor. Thank you. Good morning. May it please the Court, my name is Michael Ambry with the U.S. Attorney's Office from the District of Arizona. I'm here on behalf of the Homeland Security. Counsel, was there a discovery violation with the Allen Declaration? No, there was not a discovery violation. The declaration, the subject matter of the declaration, and Mr. Allen's knowledge of it, and Mr. Allen being a potential witness, was disclosed. You can find, let me give you the record site. It's ER 671, excuse me, that's the declaration itself. That's what he's objecting to. That's right. It's ER 159 is where that information begins. That's our response to the motion to strike in the trial court, and attached to that, as exhibits, are the discovery responses, where the subject matter of the testimony is disclosed, and disclosures? Not in the initial disclosures, and that's what plaintiff's objection is. It wasn't in the initial disclosure. It was in subsequent discovery responses, and Rule 26 specifically allows for supplementation of initial disclosures by information provided in discovery. There's absolutely no discovery violation. The information was disclosed, and that's the answer. Thank you. What did you think of Judge Velasco's order? It's pretty sparse, and I recognize that's typically not the way an order off of a motion for summary judgment appears, but, you know, summary judgment can be affirmed for any reason in the record that supports summary judgment, and what I've tried to provide the court is the reasons why summary judgment was appropriate, and what I'd like to do... You know, you call it sparse. I call it weird. I mean, it's a one-sentence Bible verse. Yeah. I don't quite get what was that all about, you know? I don't know. I don't know. It's also very unusual to rule on a summary judgment motion without ruling on motions in limine, so we know what's in and what's out, and that strikes me as quite unusual. Well, the motions in limine were actually pretrial motions. Summary judgment was filed first. I can't recall if there were motions in limine in connection with the summary judgment motion. The motion to strike. There was a motion to strike, but the motions... In this case, trial was approaching very quickly. Motion for summary judgment was on file, hadn't been the motion to strike the Allen declaration. It seems to me that the Allen declaration is part and parcel of this problem, isn't it? I'm sorry, Your Honor, if you'd explain. I'm just talking about the sequence in which the trial court approached the motion for summary judgment, so there's the problem that Judge Silverman has which is that there's a very very sparse order, and then the other problem, I think, is that there's this motion to strike, and it's I think that's right. Can you win without the Allen declaration? I think we can. If you look at Mr. Garcia's affidavit, not his affidavit, but his deposition, it's SCR 86. There's an acknowledgement by Mr. Garcia that this is a federal law enforcement position. It involves investigating crimes, working with witnesses, working with suspects, working with victims, gathering evidence. From this information, we can understand that based on the misconduct that occurred and the evidence in the record, there isn't evidence in the record to create a genuine issue of material fact that Mr. Garcia can perform the essential functions of this position. Mr. Garcia's deposition gives us a sense for what that position is, and that's what the declaration does. The declaration says . . . Now you're speaking . . . forgive me for interrupting, but now you're speaking of the Allen declaration? The Allen declaration, that's correct. And I think the pertinent portion that Your Honor is referring to is where Mr. Allen describes what the job is, what it entails, and the catastrophic effect that this type of behavior could have in a law enforcement situation. And what we're talking about here is Mr. Garcia . . . First of all, this is a case about a particular individual. It's not a case about PTSD in general. It's a case about a particular individual and whether this particular individual showed in the trial court that he could perform the essential functions of the position. The record evidence that Mr. Martinez is referring to is his completion of the training academy prior to his starting work. There's no evidence in the record connecting that to the That doesn't account for what actually occurred on December 6th to 7th. The fact that he didn't have what he describes as a PTSD episode at FLETC doesn't mean that he's qualified for the position. It occurred. And more than that, the record reflects that Mr. Garcia's expert in this case acknowledges that it could occur again despite all of the training, despite all of the treatment. Unfortunately, this type of episode, if you take Mr. Garcia's facts as true, could occur again on the job. And that's despite all of the treatment that he has gotten since that time. Mr. Garcia's plaintiff's burden to show that he's qualified for this position is that he has to show two elements. One, that he has what may be described as the prerequisites of the position. The education to be hired. That's not all. He also has to show that he can do the essential functions of the position. And I want to refer the court to a very recent Ninth Circuit opinion. It's Mayo versus PCC Structurals, Inc. We provided a supplement, a 28-J letter, regarding this case. But this is a case where the court looked at this exact issue. The case involved a welder who, because of his depressive disorder, was making threatening comments to people at work, his supervisors in particular, I think it was, and argued that, you know, his discharge, because of that behavior, because of that disability caused misconduct, was discriminatory. This court looked at the behavior itself and said the behavior shows that he cannot do the essential functions of the job because the ability to interact with people, the ability to handle stress, is an essential function of this welder job. Rejected the notion that there needs to be this individualized determination and rejected the notion that the employer had to consider the plaintiff's evidence that he could actually do the job. We don't have that evidence here. But I want to just reference what the court actually said in that case. The ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability. And this is focusing on whether that particular plaintiff was qualified to do the welder job. We raised this issue with opposing counsel a minute ago and his response was that the reason given for the termination had to do with the foul language used that night, not with a safety concern. Well, there was more than described in our opening brief. The events themselves are undisputed. If you compare in the trial court our statement of facts with plaintiff's, you know, statement of facts, the events themselves are undisputed. What happened is undisputed. The disputed part is why it happened. Plaintiff claims it was PTSD, but the events are undisputed. So in addition to the foul language, there's the use of his assertion of authority? Correct. And what else are you is, uh, because the Tempe police got his supervisor on the line or because what's the gross insubordination? Insubordination? Yes, Your Honor. Is is the treatment of his supervisor? One of his supervisors would be supervisors, Mr McKenna. Um, the threatening of Mr McKenna with, uh, you know, suggesting that he may lose his job if he doesn't cooperate with Mr Garcia. Um, this is what I would characterize as insubordination. Um, the treatment of, uh, what's called sector, which is the National Law Enforcement Communications Center. The treatment with that with that employee who, who, uh, when they call them. Exactly right. That's a very to get somebody's license plate traced. Also, that's right. He was trying to get somebody's license plate traced. Um, the problem here is whether it's insubordination, whether it's mistreatment of the public, whether it's mistreatment of other law enforcement, uh, fellow law enforcement agents. The problem is that this is conduct that can't occur in this very critical law enforcement position. These are armed law enforcement officers. They deal with stress. They deal with life threatening and dangerous situations. Uh, and it's critical that they know where they're at, what they're doing, that they have control over their behavior. Mr Garcia admits he knew he was doing something wrong. He couldn't control himself. He says he in effect blacked out. He has no memory of what happened. Um, and the problem, as I say, is even more so than a welder in the Mayo case. We're dealing with the law enforcement position here, and we're also dealing with plaintiff's burden of showing on summary judgment that he can meet the essential elements of the claim, and he can't. He was on probation, right? He just he hadn't even started it. He hadn't even had his first day. If I recall correctly, that's correct. He was a probationary employee. What effect does that have? Would it make any difference if he were off probation and pulled the stunt after? Well, probation, it's important because it goes to plaintiff's argument that he's qualified for this position by virtue of his past experience, by virtue of completing the law enforcement training center. He's not. He's probationary employee. By definition, what that means is he has to demonstrate that he can perform this job. There's an employment agreement in the record. There's also a CFR that we cite in our brief, and I could give a specific citation that says, you know, that the employment agreement says probation, you're a probationary employee. You have to demonstrate to us that you can perform this job. In essence, that's what it says. And you can be terminated for misconduct and for performance issues. There's also a CFR that says an agency shall use the probationary period to the full extent possible and shall terminate employees if they don't demonstrate that they can perform the position. That's why the probationary employment issue is important. He's not qualified by virtue of his past experience. He's not qualified by virtue of going to the training academy. What he has to show is he's qualified to do the essential functions of this job at the time of termination. What the evidence he gets in the years after this event don't show that he could have done this job at the time of termination. The evidence that's presented by a plaintiff really is speculative. They rely on a very vague and conclusory statement by their expert in the case to the effect that Mr. Garcia's condition doesn't make him unable to serve. And that's it. There's no explanation of that. It's not part of really part of what the what the expert was asked to opine about. But in deposition, this is Dr. Wilson, Dr. Wilson admits he doesn't mean that to be that Mr. Garcia could have performed the essential functions of the job at the time of termination. He doesn't mean it. He doesn't mean that statement to mean that Mr. Garcia could perform that job even now. He admitted that he didn't do any analysis about Mr. Garcia's ability to perform the job. He doesn't know what what the what this particular job entails. He's never seen a job description or met with anybody to describe it. How much of this was considered at some, forgive me for interrupting, but how much of this was considered at summary judgment? How much of this evidence? I think that the arguments were made in the trial court. Are you talking about the plaintiff's evidence? When you get into the nitty gritty about what the experts did and did not say, I come back to the problem I've got about the order in which these pretrial motions were decided. So the record is pretty fuzzy about what the judge did or did not consider. So I asked the question about the Allen declaration before you even had a chance to get started. I just think it's so pivotal about what was in and what was out. Right. I think the evidence that I'm describing now is in the record. It's in the it's in the summary judgment briefing and the court would have to consider that. All of it. None of these are subject to any of the pretrial motions. I know. I believe that's correct. I believe that's correct. The Allen declaration was subject to a motion to strike. As I said, there's absolutely no there's there's no discovery violation to the extent the court relied on it. It did so properly. It didn't abuse its discretion and relying on it. So as to the Allen declaration, I think what you're telling me is you think that you've conceded it wasn't disclosed in Rule 26. Your position is that the government supplemented your response to Rule 26 with a discovery subsequent disclosures and discovery that the motion wasn't ruled on but it could have been should have been it would have been denied so that this is properly considered at summary judgment. And I think your argument is you can win without it. Excuse me, Your Honor. And I think your argument is you can win without it. I think that's right. It's plaintiff's burden to show that he can do the essential functions of the job even without that declaration. I don't think plaintiff meets that burden with the evidence presented. But but Your Honor, I just need to correct one point. Our position is that we disclosed that under Rule 26. Rule 26 specifically includes discovery as disclosure. You don't have to do another disclosure. I take your point. I thought I if I misspoke, I understood your argument. Okay. Thank you, Mr. Ambrey. Thank you. Mr. Martinez, back to you. I think you have about three minutes and change left. Thank you. Thank you, Your Honors. The government has a number of problems in the positions they take in this case. The first has to do with, Your Honor, the whole line of authority in the Ninth Circuit that starts with Humphrey is continued in the Dark v. Curry decision and culminates in the Gambini v. Total Reveal case. And essentially what those cases stand for, Your Honor, is that when conduct resulting from a of the disability, it is not a separate basis for termination. That is the rule of this circuit. And here you have quite right, counsel, because there is a very recent Ninth Circuit case that speaks to this very issue. Did you want a chance to respond? The Mayo decision, Your Honor, is that what you're making reference to? And I did address the Mayo decision. But let me come back to Mayo. What Mayo makes very clear, Your Honor, is not that this line of authority in their decision, but they turn to a different point. In that decision, they turn to the continuum of the conduct involved, essentially that it is on the string end of conduct and that it is threatening. And it really begs the question from a practical standpoint as to how far can an employee go before they have demonstrated to an employer that there's, that there's, they cannot meet the essential functions of the position. Here you had, in Mayo, you had an individual who engaged in conduct that was repeated threats against co-employees. There's no such conduct here, Your Honor. I mean there's a vast distinction between. They have to wait here for a repetition or are you focusing on the repetition? They had to give him another chance or which part are you focusing on? I'm focusing, Your Honor, I believe that where the court focused in that decision was on the severity of the conduct. Right, so that's a different point. If it's a severity of a conduct, this situation that we're talking about here at the bar in Tempe arguably isn't as severe because there wasn't a threat. But it still gets back to the same concern. It's one, it's low level, Your Honor. I'm sorry? It's low level conduct. That which is engaged in by Mr. Garcia, in a continuum where you look to the death threats, you know, for example, did Mr. Garcia have his weapon with him? Your time is ticking and I agree with you that on a continuum this is less severe, but does that mean you win? Why does that get you there? Why isn't this enough? That's what I really need you to say. I think we do win on that point, Your Honor. And I'd like to, in the time I have, ask you to look in the record at ER 396. This is the Haiti earthquake alert that was put out by the Department of Homeland Security, includes ICE. There they specifically talk about post- deployment guide for post-traumatic stress for those individuals who were deployed from their agency to Haiti for the earthquake. And it talks about DHS employees and it particularly, specifically says common distress responses include sleep problems, restlessness, oversensitivity to perceived threats in the environment, and social withdrawal. Well, the agency clearly knows, Your Honor, that there is PTSD within its workforce, that it's something that they work with and manage and that Mr. Garcia doesn't present anything unusual in terms of, at least at the, at the department level, what they recognize with respect to their obligation in providing a workplace free of discrimination that includes those who have PTSD. Thank you for your time. Thank you, Mr. Martinez. Mr. Ambrey, thank you as well. The case just argued is submitted.
judges: Duffy, Silverman, Christen